UNITED STATES of America,
Plaintiff–Appellee,

v.

Paris F. THOMAS and Harold L. Story,
Defendants–Appellants.

Nos. 95–1612, 95–2158.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1996.

Decided May 31, 1996.

Rehearing Denied July 2, 1996.

Michael Jude Quinley (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Greg Roosevelt (argued), Edwardsville, IL, for Defendant–Appellant in No. 95–1612.

Gerald C. Bender, Chicago, IL, Gregory A. Adamski (argued), Karen Conti, Catherine A. Connolly, Adamski & Conti, Chicago, IL, for Defendant–Appellant in No. 95–2158.

Before CUMMINGS, FLAUM, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

Defendants Paris Thomas and Harold Story were tried before a jury on a four-count superseding indictment, which charged them with: (1) conspiracy to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) use or carrying of firearms during the commission of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); (3) continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848; and (4) distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The jury convicted both defendants on all four counts. Story was sentenced to life imprisonment, and Thomas received a total sentence of 420 months. The defendants appeal their convictions on various grounds and also appeal their sentences. We affirm in part, reverse in part, and remand for a new trial and resentencing.

## I.

In late 1991, Defendant Thomas joined Edgar Bradford and Kevin Garnett in order to distribute crack cocaine to street dealers in Metropolis, Illinois. The three friends began this enterprise by pooling their resources to obtain crack and powder cocaine from an acquaintance of Thomas in Chicago, Illinois. The three converted the powder cocaine that they purchased into crack cocaine and distributed their wares to local crack dealers in Metropolis. Thomas was the "leader" of this profitable venture, for he had the connection to the cocaine supplier and could arrange for the powder cocaine to be converted into crack. In the spring of 1993, the group decided to expand their crack cocaine business by bringing Defendant Story into the fold. Story was able to procure greater quantities of cocaine than Thomas and therefore became the supplier, as well as the "leader," of the group. As Thomas had done before him, Story made regular trips to Chicago to buy crack and powder cocaine, which he then cooked into crack. Thomas and Garnett sometimes accompanied Story on his drug purchasing trips to Chicago. Story usually fronted the money for the drug purchases and then received a return on his investment once Thomas, Bradford, and Garnett had successfully distributed the crack to the local dealers. Story was assisted in his drug-distributing activities by his bodyguard, known as "Cheeseburger," and by his brother, known as "Cup," who often acted as a courier in drug and money exchanges between Story and Thomas. The defendants continued to purchase and distribute crack until their arrests in January of 1994.[1]

In the original conspiracy charge, Thomas, Story, Bradford, Garnett, and many of the street dealers who worked under them were named as defendants. Most of the other original defendants, including Bradford and Garnett, pled guilty and agreed to testify against Thomas and Story in exchange for favorable sentencing recommendations. At trial these admitted co-conspirators provided the jury with a detailed account of the inner workings of the alleged drug conspiracy. In addition, Bradford and Garnett testified that Story was a member of a street gang, specifically the Mafia Insanes of the Almighty Vice Lord Nation. Thomas, Garnett, and Bradford became involved with the gang by taking an oath of loyalty.[2] Story later provided Thomas and Garnett with a written copy of the oath and principles of the gang, and Story and Thomas occasionally reminded Garnett to follow the principles. The oath of the Almighty Vice Lord Nation, which the government introduced into evidence, provides, in part, that "[n]or in the threat of death will I deny those brothers who stand beside me." The principles of the Mafia Insanes, which were also admitted into evidence, include a direction to "obey all commands without question fear or doubt." Trial testimony further revealed that Vice Lords were not supposed to testify against fellow Vice Lords. Many of the street dealers who worked under the defendants recognized that the defendants, along with Garnett and Bradford, were affiliated with the Mafia Insane Vice Lords. The district court admitted the preceding evidence despite defendants' motion in limine to exclude all evidence of their gang affiliation.

The government introduced significant evidence at trial showing that firearms were involved in the alleged drug conspiracy. Story possessed a .38 caliber handgun that he kept at home for protection. There was testimony that Thomas and Bradford possessed a .22 caliber pistol, which was obtained by Thomas in settlement of a customer's crack debt. They kept this pistol at Bradford's home in case someone tried to steal their drugs or money. Additionally, some of the street dealers testified that they possessed handguns for protection against other drug dealers. There was also testimony indicating an active employment of fire-

---

1. The distribution charge was based on a specific incident where Garnett sold an ounce of crack to an undercover police officer for $1400. The sale was assisted by Bobby Schultz, a police informant who arranged with Thomas for the crack to be delivered to the police by Garnett.

2. Some witnesses also testified that Thomas claimed he was a member of the Mafia Insane Vice Lords.

arms by certain members of the drug-dealing enterprise. For example, Jerome Bray, one of the street dealers who pled guilty to the conspiracy charge, once brought a handgun with him to chase competing dealers away from the street corner where he was selling crack.[3] On another occasion, Bradford and other members of the drug conspiracy engaged in a shoot-out with a group of out-of-town crack dealers who were trying to sell in Metropolis.[4]

The well-organized drug conspiracy began to collapse with the arrest of Kevin Garnett on December 28, 1993. Soon afterward Story accused Anthony Powell, a police informant, of getting Garnett "busted" and told Powell that if anyone else was busted "the matter will be taken care of." Story, Thomas, and a number of their alleged co-conspirators were arrested a couple of weeks later, but Story continued making threats. Jerome Bray testified that, while he and Story were in jail, Story threatened to kill him and others involved in the alleged conspiracy if they testified against Story. Story told Bray to pass this threat along to certain co-conspirators that were in jail.

The district court, in addition to admitting evidence of threats made by Story, admitted evidence of third party and anonymous threats on witnesses. The first witness at trial was Crystal Riley, a police informant and an admitted crack dealer, who testified that Cup Story told her that he would kill anyone who testified against his brother. On the day before she testified, an anonymous telephone caller threatened to kill her if she testified against Story. Later that day she found a bottle of lighter fluid on the front porch of her house, along with a note that read "We came for you. We'll be back. Bitch, die." Jennifer Hooper, Bradford's girlfriend and the mother of his child, testified that, prior to her grand jury testimony, an anonymous caller threatened to kill her

and her child if Bradford testified. A few weeks before trial, an unidentified person pointed a gun at her head while she was sitting in her car at a stoplight. Yolanda Powell testified that her life was threatened by an unidentified man a couple of weeks before trial. The man told her that her brother, Anthony Powell, had gotten people into trouble and that he should not testify at trial. The defendants objected to the testimony regarding threats by Cup Story and unknown individuals, arguing that the threats were hearsay and that any probative value they had would be substantially outweighed by the danger of unfair prejudice.[5]

## II.

On appeal the defendants present three main grounds for reversing their convictions. First, they assert that the Supreme Court's recent decision in *Bailey v. United States*, — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), mandates a reversal of their 18 U.S.C. § 924(c) convictions. Second, they argue that the district court abused its discretion in admitting evidence of their gang affiliation. Third, they maintain that the district court abused its discretion by admitting evidence of threats that they did not make. The defendants also briefly raise a double jeopardy claim and a number of issues with respect to their sentences.

The defendants argue that their convictions on count two of the superseding indictment, which charged them with both using and carrying a firearm during and in relation to the drug trafficking conspiracy, must be reversed as a result of the Supreme Court's recent decision in *Bailey*. Section 924(c)(1) punishes a defendant who, "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm." 18 U.S.C. § 924(c)(1). The Court in *Bailey* held that "use" under § 924(c)(1) means an "active employment of the fire-

---

**3.** The record is not clear as to whether Bray actually brandished the handgun in his efforts to drive out the competing dealers.

**4.** The shoot-out ensued after Bradford physically assaulted the rival dealers, in retaliation for their hitting Cameron Riley, Bradford's cousin and an admitted street dealer for the conspiracy. Riley

and Bradford both testified on cross examination that this incident was unrelated to their drug-dealing activities.

**5.** Other witnesses briefly mentioned anonymous hang-ups and threats, without objection from the defendants.

arm." *Id.* at ——, 116 S.Ct. at 506. Such active employment "certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at ——, 116 S.Ct. at 508. The Court made it clear that the mere placement of a firearm to provide a sense of security or to embolden cannot constitute a "use." *Id.* To convict a defendant under § 924(c)(1) for using a firearm, the government is required to show more than the "inert presence" or "storage" of a firearm. *Id.* At the close of evidence, the district court, in accordance with our Circuit precedent at the time, instructed the jury that:

> A firearm is used during and in relation to a drug-trafficking crime if the circumstances of the case show that the firearm facilitated or had a role in the crime by providing a person with the security and confidence to undertake a transaction or series of transactions involving illegal drugs and currency.

This instruction is clearly incorrect in light of *Bailey,* and the government concedes as much. *See United States v. Smith,* 80 F.3d 215, 220 (7th Cir.1996) (holding identical instruction erroneous under *Bailey*). The government nonetheless asks us to affirm the § 924(c)(1) convictions, in effect requesting that we find that the erroneous jury instruction was harmless. An erroneous jury instruction is harmless if, looking at the instructions and the record as a whole, we are convinced that a properly instructed jury would have reached the same verdict. *See, e.g., United States v. Williams,* 33 F.3d 876, 879 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 236 (1995); *United States v. Goines,* 988 F.2d 750, 773 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993). Because the evidence was sufficient to convict the defendants, but we are not convinced that a properly instructed jury would have done so, we conclude that the proper course is to reverse the § 924(c)(1) convictions and remand for a new trial.

The evidence produced at trial was sufficient to sustain the convictions under § 924(c)(1) for "using or carrying" a firearm in relation to the drug conspiracy. One witness testified that Jerome Bray, an alleged conspiracy member, once brought a handgun with him to chase competing dealers away from the place where he was dealing drugs. This conduct clearly constitutes "carrying" a firearm in relation to the drug conspiracy. *See United States v. Baker,* 78 F.3d 1241, 1247 (7th Cir.1996).[6] Furthermore, the evidence showed that Bradford "used" a handgun in a shoot-out with out-of-town crack dealers who were trying to sell in the defendants' turf. The jury could have reasonably inferred that the shoot-out was drug-related, despite testimony to the contrary. On the other hand, the government presented extensive evidence at trial that may have led the jury to convict the defendants under the incorrect instruction. Various witnesses testified that Story, Thomas, and Bradford owned handguns, which they kept at home to protect their drugs and drug proceeds. Some of the street dealers involved in the conspiracy also testified that they had guns for protection against other drug dealers. Contrary to the jury instructions, this evidence of mere possession could not establish "use" within the meaning of § 924(c)(1), as defined by *Bailey.* —— U.S. at ——, 116 S.Ct. at 508. The jury may well have relied upon this evidence in convicting the defendants. Thus, we are not convinced that a properly instructed jury would have convicted the defendants of violating 18 U.S.C. § 924(c)(1). We believe that the determination of the defendants' guilt is best left to a properly instructed jury and therefore remand for a new trial on this count.

### III.

■ The defendants do not seriously maintain that the evidence that was present-

---

**6.** The defendants argue that they did not personally use or carry any firearms. This argument, however, completely ignores the *Pinkerton* doctrine, which makes defendants liable for the actions of their co-conspirators that were done in furtherance of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In fact, we have specifically found that "[a] conspirator in a drug conspiracy can be held liable for a coconspirator's § 924(c) violation because it is reasonably foreseeable that a firearm may be carried during a drug transaction." *United States v. Pazos,* 993 F.2d 136, 141 (7th Cir.1993). The defendants do not present a plausible argument that the evidence was insufficient to support their conspiracy convictions.

ed at trial was insufficient to convict them on the conspiracy, CCE, and distribution charges.[7] Instead, the defendants briefly raise a number of evidentiary issues, only two of which merit discussion. The defendants challenge the trial court's admission of gang and threat evidence, arguing that the danger of unfair prejudice from this evidence substantially outweighed its possible probative value. See Fed.R.Evid. 403. Our review of a trial court's evidentiary rulings is limited to determining whether the court abused its discretion. *United States v. Butler,* 71 F.3d 243, 250 (7th Cir.1995); *United States v. Degaglia,* 913 F.2d 372, 375 (7th Cir.1990). With respect to Rule 403 determinations, we have noted that the district judge, "who saw and heard the evidence firsthand, can best balance probity and prejudice." *United States v. McNeese,* 901 F.2d 585, 598 (7th Cir.1990). Thus, the defendants bear a heavy burden in challenging the trial court's decision to admit evidence under Rule 403. *Butler,* 71 F.3d at 250.

### A.

The defendants maintain that the evidence of their gang affiliation was irrelevant and amounted to nothing more than a "smear campaign" against them. Evidence may be excluded by the district court "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. This Court has "long recognized that gang membership has probative value under appropriate circumstances." *United States v. Lewis,* 910 F.2d 1367, 1372 (7th Cir.1990). Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue. See *United States v. McKinney,* 954 F.2d 471, 479 (7th Cir.), *cert. denied,* 506 U.S. 1023, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992) (allowing evidence of how gang controlled

and disciplined members to show complete context of murder and conspiracy); *Lewis,* 910 F.2d at 1372 (allowing evidence of gang membership to establish joint venture and thereby constructive ownership of firearms); see also *United States v. Sloan,* 65 F.3d 149, 150–51 (10th Cir.1995) (allowing evidence of gang membership to prove existence of conspiracy and to show basis of relationship between defendant and witnesses who participated in drug distribution conspiracy); *United States v. Johnson,* 28 F.3d 1487, 1497 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995) (allowing evidence of gang membership to clarify connections between defendants in drug distribution conspiracy case); *United States v. Robinson,* 978 F.2d 1554, 1562–63 (10th Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1855, 123 L.Ed.2d 478 (1993) (allowing evidence of gang membership to establish conspiracy agreement and purpose and to show defendants' knowledge of conspiracy). However, we have also noted that evidence of gang affiliation can oftentimes be unfairly prejudicial, and we therefore require district courts to carefully consider the admissibility of such evidence. See, e.g., *Butler,* 71 F.3d at 251; *United States v. Rodriguez,* 925 F.2d 1049, 1053 (7th Cir.1991).

■ We cannot conclude that the district court abused its discretion when it admitted evidence of the defendants' affiliation with the Mafia Insane Vice Lords.[8] The gang evidence that the district court admitted helped demonstrate the existence of the conspiracy and the connections between members of the conspiracy. The evidence showed that Story distributed the gang's oath and principles to other members of the conspiracy. Thomas, Garnett, and Bradford, the other upper-level conspirators, took an oath of loyalty not to betray their fellow "brothers."

---

**7.** The distribution conviction was based on evidence of a controlled buy of crack between Kevin Garnett and an undercover police officer. Story claims that because he did not personally sell the crack, he cannot be found guilty on this count. Again, however, Story completely ignores the *Pinkerton* doctrine.

**8.** The defendants claim that they were not associated with the same gang, relying on bits of the trial transcript that refer to the "Mafian Saints"

or the "Saints." After reviewing the entire record, we are convinced that there is extensive evidence showing that the defendants, as well as Garnett and Bradford, were associated with the Mafia Insane Vice Lords. The limited references in the record to "Mafian Saints" or "Saints" likely reflect the failure of counsel and witnesses to clearly enunciate "Mafia Insanes" rather than the existence of a separate gang.

The principles of the gang, which the defendants reminded Garnett to follow, demanded obedience to the commands of superiors. Furthermore, Vice Lords were forbidden to testify against one another. This evidence was certainly relevant to establish the continuing existence of the criminal conspiracy, for it made it more likely that the goal of the conspiracy could be achieved.[9] In addition, the gang evidence was relevant to prove that the defendants occupied a position of authority in the conspiracy, which was a necessary element of their CCE convictions.[10]

 Indisputably, the evidence of gang affiliation was "damaging to [the defendants] in the eyes of the jury." *Lewis,* 910 F.2d at 1372. Yet it is the danger of *unfair* prejudice that must be balanced against probity to determine the admissibility of evidence under Rule 403. The danger of unfair prejudice from gang evidence stems from the potential inference that a defendant is guilty by association. In this case, however, the gang-related evidence did not substitute for direct evidence that the defendants actually joined the drug distribution conspiracy.[11] This limited any unfair prejudice that might have resulted from the admission of the gang evidence.

*See Johnson,* 28 F.3d at 1497–98 (holding gang evidence admissible because "it did not substitute for evidence of actual participation in the drug distribution ring"). Thus the district court was within its discretion in concluding that the danger of unfair prejudice from the gang-related evidence did not substantially outweigh its probative value.

### B.

The defendants next argue that the district court erred in admitting evidence that the lives of witnesses were threatened by Cup Story and unidentified individuals.[12] The district court determined that the threat evidence was relevant to the credibility of the witnesses who were threatened and that this probative value outweighed any danger of unfair prejudice. Evidence of threats is "subject[ ] to the same Rule 403 balancing test as other relevant evidence." *United States v. Qamar,* 671 F.2d 732, 736 (2nd Cir.1982). Yet we have cautioned courts regarding the admission of threat evidence to assess the credibility of witnesses. In *Dudley v. Duckworth,* 854 F.2d 967, 970–71 (7th Cir.1988), *cert. denied,* 490 U.S. 1011, 109

---

**9.** A conspiracy is "an agreement to commit a crime." *United States v. Lechuga,* 994 F.2d 346, 348 (7th Cir.) *(en banc), cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). Undoubtedly, the tenets of the gang would be conducive to holding such an agreement together.

**10.** To convict the defendants on the CCE charge, the government needed to demonstrate, among other things, that the defendants exercised managerial or supervisory control over at least five members of the conspiracy. *See* 21 U.S.C. § 848(c)(2) (Supp.1996); *United States v. Herrera–Rivera,* 25 F.3d 491, 498 (1994).

**11.** In fact, the government did not attempt to introduce evidence that the gang itself distributed crack or engaged in other illegal activities. This contrasts with other cases in which we have held evidence of illegal gang activities admissible. *See, e.g., McKinney,* 954 F.2d at 479 (allowing general evidence of Aryan Brotherhood's illegal activities, including racketeering, drug dealing, and murder). Although street gangs generally "suffer from poor public relations," *Lewis,* 910 F.2d at 1372, evidence that a gang is directly involved in illegal activities exacerbates the potential for unfair prejudice from evidence of gang affiliation.

**12.** At trial the defendants objected to the admission of this evidence on hearsay and Rule 403 grounds. On appeal, the defendants do not argue that the threat evidence was improperly admitted as hearsay. Indeed, the threats were not hearsay, for the threats were not admitted to prove the truth of the words asserted, but rather were admitted as "verbal acts" that potentially affected the credibility of witnesses. *See United States v. Robinzine,* 80 F.3d 246, 252 (7th Cir. 1996) (statement offered to show why witness recanted testimony not hearsay); *United States v. Gironda,* 758 F.2d 1201, 1218 (7th Cir.) (threats offered to show defendants' involvement in conspiracy not hearsay), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985); *United States v. Swanson,* 9 F.3d 1354, 1358 n. 7 (8th Cir.1993) (threats offered to attack credibility and prove propensity not hearsay); *United States v. Williams,* 993 F.2d 451, 457–58 (5th Cir.1993) (threats offered to show why witness feared for life not hearsay); *but see United States v. Patterson,* 23 F.3d 1239, 1249 (7th Cir.) (finding, in dicta, that threats offered to show witness changed story were hearsay), *cert. denied,* —— U.S. ——, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994). Simply put, "the evidence was offered as the fact of an assertion and not as [an] assertion of a fact and was therefore not hearsay." *United States v. Garza,* 754 F.2d 1202, 1206 (5th Cir.1985).

S.Ct. 1655, 104 L.Ed.2d 169 (1989), we granted habeas relief as a result of the improper admission of threat evidence, which was offered during a state court trial, purportedly to explain a witness' "extreme nervousness." The *Dudley* court noted the absence of evidence in the record indicating nervousness on the part of the witness and therefore found that "the evidence of threats was intended more to prejudice the defendants ... than to explain away any nervousness of the witness." *Id.* at 972. We thus concluded that "the prejudicial effect of the testimony ... weighed against its necessity" dictated habeas relief. *Id.* In contrast to *Dudley,* this Court in *Gomez v. Ahitow,* 29 F.3d 1128, 1139 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995), refused to grant the writ after a state trial court admitted evidence of threats to explain a witness' delay in coming forward with information. We noted that the *Gomez* prosecution, unlike that in *Dudley,* introduced the threats for a legitimate reason—to explain actions that would otherwise hurt the witness' credibility in the eyes of the jury. *Id.*

■ These cases indicate that trial courts must carefully consider the probative value of threat evidence that is to be admitted for the purpose of assessing the credibility of witnesses. Together *Dudley* and *Gomez* teach that threat evidence has extremely limited probative value towards credibility, unless the evidence bears directly on a specific credibility issue regarding the threatened witness. For example, threat evidence can be relevant to explain a witness' inconsistent statements, delays in testifying, or even courtroom demeanor indicating intimidation. *See, e.g., Gomez,* 29 F.3d at 1139; *Qamar,* 671 F.2d at 736 (holding threat evidence admissible under Rule 403 to explain demeanor of witness who testified almost inaudibly and visibly wanted to get off witness stand);

*United States v. DeLillo,* 620 F.2d 939, 945–46 (2nd Cir.) (holding threat evidence admissible under Rule 403 to impeach witness), *cert. denied,* 449 U.S. 835, 101 S.Ct. 107, 108, 66 L.Ed.2d 41 (1980). In such situations, the evidence of threats is necessary to account for the specific behavior of a witness that, if unexplained, could damage a party's case.

■ Rather than explaining specific behavior relevant to the credibility of the threatened witnesses, the threat evidence in this case was admitted to permit the jury to fully evaluate the general "credibility" and "bias" of the threatened witnesses. We conclude that this decision was an abuse of the district court's discretion under Rule 403. The district court did not make a finding that the threatened witnesses appeared intimidated, and the record does not reveal to us the demeanor of these witnesses. The government seems to imply that the threat evidence was probative because it enhanced the overall believability of the witnesses by showing that they testified against the defendants in the face of threats. The probative value of such evidence, however, is extremely limited at best. We fail to see any need for the introduction of threat evidence to "boost" the testimony of these witnesses.[13] Furthermore, evidence of threats on witnesses can be highly prejudicial. Indeed, the Third Circuit has found that threats "constitute a striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *United States v. Guerrero,* 803 F.2d 783, 785 (3rd Cir.1986) (internal quotations and citations omitted). Thus any probative value of the threat evidence was more than substantially outweighed by the danger of unfair prejudice, and the district court abused its discretion in concluding differently.[14]

---

13. In fact, the threat testimony of Yolanda Powell was the only testimony that she gave at trial; thus her credibility would not even have been at issue without the threat testimony. This fact suggests that, as in *Dudley,* the prosecutor intended the threat evidence more to prejudice the defendants than to explain away any credibility problems. 854 F.2d at 972.

14. The government also argues that we should uphold the district court's decision because Cup Story's threat on Crystal Riley was relevant to establish Cup's continuing participation in the conspiracy at the behest of Harold Story. This argument, however, fails to address the fact that the district court erred by admitting extensive evidence of anonymous threats on Crystal Riley,

■ Although the district court erroneously admitted evidence of third-party and anonymous threats, this error was, in the final analysis, harmless. If we are convinced that an evidentiary error did not have "a substantial and injurious effect or influence on the jury's verdict," we will deem the error harmless and thus allow the jury's verdict to stand. *United States v. Hanson,* 994 F.2d 403, 407 (7th Cir.1993) (internal quotations omitted). The prosecution in this case presented overwhelming evidence of both of the defendants' guilt on the conspiracy, CCE, and distribution charges. Moreover, the defendants do not contest the district court's decision to admit evidence of threats by Story, which were relevant to show Story's consciousness of guilt. *See, e.g., United States v. Balzano,* 916 F.2d 1273, 1281 (7th Cir. 1990); *Guerrero,* 803 F.2d at 785. In this situation, we are convinced that the erroneous admission of threat evidence did not affect the jury's ultimate decision.

### IV.

■ Defendant Story also claims that his trial was barred by the Double Jeopardy Clause because of a prior civil forfeiture action against him. *See Department of Revenue v. Kurth Ranch,* —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (holding particular civil tax on drugs imposed after criminal sanction violated Double Jeopardy Clause); *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (holding that civil sanctions imposed after criminal punishment may violate Double Jeopardy Clause). Story did not raise this claim in district court, and we therefore review his claim for plain error. *United States v. Penny,* 60 F.3d 1257, 1261 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). More importantly, in order to prevail on his double jeopardy claim, Story would have to show that he made a claim of ownership at the forfeiture proceeding, thereby becoming a party to the forfeiture. *Penny,* 60 F.3d at 1262; *United States v. Torres,* 28 F.3d 1463, 1465 (7th Cir.) (hold-

ing non-party not at risk in forfeiture proceeding and therefore jeopardy does not attach), *cert. denied,* —— U.S. ——, 115 S.Ct. 669, 130 L.Ed.2d 603 (1994). Story has made no such showing, for the record reveals only that a 1986 Buick automobile was seized by the DEA on February 10, 1994 and forfeited on May 20, 1994. There is no evidence in the record indicating that Story claimed an ownership interest in the car in any forfeiture proceeding. In this situation we can only conclude that the Double Jeopardy Clause provides no relief for Story.

### V.

Finally, the defendants challenge their sentences under the Sentencing Guidelines on a number of grounds, all of which are without merit and require little discussion. The defendants first argue that the disparity in penalties between crack and cocaine in the Sentencing Guidelines is racially discriminatory, has no rational basis, and consequently violates the Equal Protection Clause. We have consistently rejected this precise argument, and the defendants provide no compelling reason for us to revisit our prior holdings. *See, e.g., United States v. Baker,* 78 F.3d 1241, 1248 (7th Cir.1996); *United States v. Chandler,* 996 F.2d 917, 918–19 (7th Cir. 1993).

■ At Story's sentencing hearing, the district court determined Story's base offense level under Sentencing Guideline § 2D1.1, based on a finding that Story was responsible for the distribution of at least 1.5 kilograms of crack. Story challenges this finding, arguing that the conspiracy did not distribute this amount after his involvement. We review the district court's factual determination of the quantity of drugs for clear error. *United States v. Johnson,* 46 F.3d 636, 638 (7th Cir.1995). For sentencing purposes, "[e]ach conspirator is responsible for the amount of cocaine he actually distributed and the amount involved in transactions reasonably foreseeable to him." *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993). Edgar Bradford testified at Story's sentenc-

Jennifer Hooper, and Yolanda Powell. We therefore need not determine the additional relevancy that Cup Story's threat may have had in deter-

mining that the conspiracy continued after Harold Story's arrest.

ing hearing that he alone had distributed two kilograms of crack that he obtained from Story. Bradford further testified about specific additional amounts of crack for which Story was responsible.[15] The district court credited Bradford's testimony in determining that Story was responsible for at least 1.5 kilograms of crack. Story does not even attempt to explain how the district court's reliance on this testimony was erroneous. Thus, we conclude that the district court did not commit clear error in determining the amount of crack attributable to Story.

 After determining Story's base offense level, the district court applied a two-level enhancement for obstruction of justice (U.S.S.G. § 3C1.1) and denied Story a reduction for acceptance of responsibility (U.S.S.G. § 3E1.1). A district court's determinations that a defendant obstructed justice and did not accept responsibility are both findings of fact, which we review for clear error. *United States v. Severson*, 3 F.3d 1005, 1012 (7th Cir.1993). Sentencing Guideline § 3C1.1 provides for an increase in offense level "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The district court found that this enhancement was warranted based on the evidence at trial indicating that Story had threatened Anthony Powell and Jerome Bray during the investigation and prosecution of this case. Counsel for Story argues that the district court erred because Story denies making these threats. We can only deem this argument baseless in light of the evidence produced at trial. Finally, Story argues that the district court erred in refusing to reduce his sentence for acceptance of responsibility. We have held, however, that a defendant "who has both gone to trial and obstructed justice, must overcome quite a strong presumption to convince a court he still is entitled to a reduction for acceptance of responsibility." *United States v. Curtis*, 37 F.3d 301, 309 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995). Story maintains that

he offered to change his plea before and after the trial, but the government's sentencing recommendation was too high to accept. The district court rejected this patently meritless argument, as do we. *See United States v. Gomez*, 24 F.3d 924, 926 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 280, 130 L.Ed.2d 196 (1994).

## VI.

In conclusion, we AFFIRM the defendants' conspiracy, CCE, and distribution convictions, and REVERSE the defendants' convictions under 18 U.S.C. § 924(c). Accordingly, we REMAND for a new trial on the § 924(c) count and for resentencing on all counts so that the district court can "reconsider its plan as a whole in sentencing." *United States v. Lowry*, 971 F.2d 55, 66 (7th Cir. 1992).

---

15. Bradford recalled that on one occasion Story brought half a kilogram of crack to Garnett's house to be cut up and then sold. Bradford also testified that Story admitted to having Cup "working" on another kilogram after Story was in jail.