

# IN THE
# TENTH COURT OF APPEALS

## No. 10-10-00172-CR

**JERRY MACK NEWLAND,**

Appellant

v.

**THE STATE OF TEXAS,**

Appellee

**From the 54th District Court
McLennan County, Texas
Trial Court No. 2008-2138-C2**

# O P I N I O N

Bobby Evans, an Animal Control Officer for the City of Bellmead, was found shot to death in the city's animal shelter. The case went unsolved for seven months before Jerry Mack Newland and another were identified as suspects in the shooting and arrested. Newland made it known to several people, including inmates in prison and the McLennan County jail, that he shot Evans.

Newland was convicted of murder and sentenced to life in prison. *See* TEX. PENAL CODE ANN. § 19.02 (West 2003). Because the error in admitting evidence of a

threat against a witness was harmless and because the error, if any, in admitting hearsay testimony was cured, the trial court's judgment is affirmed.

## EVIDENCE OF A THREAT

In his first issue, Newland argues that the trial court erred in allowing the State to introduce evidence that a witness had been threatened by an unknown person where such evidence did nothing to bolster the witness's credibility and was highly prejudicial.

Heather McHargue was the only witness to testify who was at the scene at the time of the murder. Her testimony placed Newland, who did not testify, at the scene. On re-direct examination, the State asked McHargue if she knew any active members of the Aryan Brotherhood. Newland objected. After a bench conference that was not recorded, the parties conferred in the trial court's chambers. There, the State explained that McHargue had been threatened by an unknown person who was a member of the Aryan Brotherhood, that she knew Newland was a member of the Aryan Brotherhood, and that the testimony was relevant because McHargue's credibility had been attacked on cross-examination. Newland protested, arguing that the evidence of the threats was irrelevant and that whatever probative value it had would be outweighed by its prejudicial effect. The trial court overruled Newland's objections and allowed the following testimony.

> Q. And are you aware of members of the Aryan Brotherhood that are here in the Bellmead area and the Waco area?
>
> A. Yes, ma'am.

Q. Okay. Are you aware if the man you know as Dusty, if Jerry Newland is a member of the Aryan Brotherhood?

A. Yes, ma'am.

Q. Now, we had talked and you had come to interview with us before; is that correct?

A. Yes, ma'am.

Q. And at some point, Heather, did you mention an incident from someone-that someone came to your house in reference to you testifying?

A. Yes, ma'am. That's been months if not a year or so ago.

Q. Months or a year ago. And can you, without going into what he told you, can you -- can you tell the jury about that?

A. I was at my house with my children and I had -- my doorbell rings and a guy -- it was a big -- a big guy had a tattoo, you know, on his neck. And that's the only tattoo I could see at the time. He told me that it would be the best of my interest just to leave well enough alone as far as that murder trial goes with the dogcatcher.

Q. Did you take that conversation to be in a threatening manner?

A. Yes.

Q. You talked about tattoos. What kind of tattoo did you see?

A. They all look like a green mess to me. But it's -- he just had a tattoo, you know, a tattoo on his neck. You could tell it went around -- around the back of his arm, shoulder.

Q. Okay. And so that the record is clear, you have no knowledge that Dusty or Jerry Newland sent that person out?

A. No.

Q. Okay. And just that this incident happened?

A. Right.

Newland argues that the testimony about the threat from a third party was not relevant because it did not bolster McHargue's general credibility; and he argues in the alternative, if it was relevant, the probative value of the testimony was outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 401, 403.

Bolstering the credibility of a witness has traditionally been the attempt to use prior consistent statements by the same witness to enhance the witness's credibility. "Bolstering" has been defined, however, as "any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing 'to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'" *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (*quoting Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993)). In other words, bolstering is the introduction of evidence that the witness is believable without that evidence being relevant to the proceeding. Thus, bolstering, generally, is prohibited.

When a witness's credibility has been attacked by any form of impeachment, however, the sponsoring party may *rehabilitate* the witness but only in direct response to the attack. *Michael v. State*, 235 S.W.3d 723, 726 (Tex. Crim. App. 2007). "The wall attacked at one point may not be fortified at another and distinct point." *Id*. (quoting CHARLES T. MCCORMICK, MCCORMICK ON EVIDENCE, § 49 at 116 (2d ed. 1984)). McHargue was impeached by prior inconsistent statements, and her memory of some of the events about which she testified was questioned. The State offered no explanation as to how the evidence of a threat, especially one not made by Newland, was a direct

response to the subject of McHargue's impeachment. After reviewing the record, we fail to see how this threat evidence was relevant to rehabilitating McHargue's credibility. *See United States v. Cooper*, 314 Fed. Appx. 729, 730 (5th Cir. 2009) ("When it is not known who made or caused that threat, at least absent some special circumstance not present here, evidence that a witness has been threatened would generally be inadmissible.")

Even if the evidence was relevant, we find that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. "Probative value," means more than simply relevance. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006); s*ee Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990) (op. on reh'g). It refers to the inherent probative force of an item of evidence--that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation--coupled with the proponent's need for that item of evidence. *Id*. "Unfair prejudice" refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Id*.; *Montgomery v. State*, 810 S.W.2d at 389. Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id*.

Newland admits that he has not found any Texas case law regarding the probative value or prejudicial effect of evidence of a threat by a third party. The State provided no specific case law either. Nor have we located any. Newland has, however, pointed us to Federal case law that is instructive in this area. We agree with the 7th

Circuit that trial courts must carefully consider the probative value of threat evidence that is to be admitted for the purpose of assessing the credibility of witnesses. *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996). We also agree that threat evidence has extremely limited probative value towards credibility, unless the evidence bears directly on a specific credibility issue regarding the threatened witness. *Id.* Evidence of threats on witnesses also can be highly prejudicial, especially when there is no connection between the defendant and the threat. *See id.*; *Dudley v. Duckworth*, 854 F.2d 967, 970 (7th Cir. 1988); *United States v. Guerrero*, 803 F.2d 783, 785 (3rd Cir. 1986).

In this case, the threat evidence was not offered directly to show evidence of guilt. *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) (An attempt to tamper with a witness is evidence of "consciousness of guilt."). Rather, it was offered for the purpose of bolstering McHargue's testimony. Yet, there was no specific credibility issue verbalized by the State that would require introduction of the threat evidence. On cross-examination, McHargue was generally impeached by prior inconsistent statements. Her memory of some of the events about which she testified was also questioned. The State did not need the threat evidence. Further, the threat was non-specific. McHargue stated that a "big guy" came to her house and told her that it would be in her best interest just to leave well enough alone. The threat occurred 6 months to a year before her testimony and occurred after Newland and his co-defendant were arrested for the murder. There was no testimony that the threat was for Newland's or his co-defendant's benefit. In fact, the State made a point to inform the jury that Newland did not send this person to make the threat. Also, although

McHargue was allowed to testify that Newland was a member of the Aryan Brotherhood, her testimony was very unclear as to whether the person who threatened her was also a member of the Aryan Brotherhood. McHargue only testified that the person had a tattoo on his neck that was a "green mess." She never clarified what that tattoo symbolized.

While we are not prepared to say that all threats by third parties are not admissible, it appears the probative value for bolstering this witness's testimony with a non-specific threat not linked to the defendant, other than generally, and gang affiliation without being able to establish that the person making the threat was in the same gang as the defendant, and which may have occurred a year before trial is very low and the danger of unfair prejudice is high. Therefore, it was error to admit evidence of the threat.

We must next determine whether the admission of the threat evidence was harmless under Rule 44.2(b). *See Prible v. State*,175 S.W.3d 724, 737 (Tex. Crim. App. 2005); TEX. R. APP. P. 44.2(b). Rule 44.2(b) provides that any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b). After reviewing the record, and given the other evidence of guilt, including *numerous* statements to others by Newland against his interest, we hold the error did not affect Newland's substantial rights and was, therefore, harmless. *See id*.; s*ee also United States v. Cooper*, 314 Fed. Appx. 729, 731 (5th Cir. 2009); *United States v. Thomas*, 86 F.3d 647, 655 (7th Cir. 1996).

His first issue is overruled.

## HEARSAY

In his second issue, Newland complains that the trial court erred in allowing the State to introduce a hearsay statement of Lee Rhodes[1] through his wife, Kim, which did not admit involvement in any type of criminal activity and was not admissible as a statement against interest. On direct examination, the State asked Kim whether Rhodes said "anything about what had happened in the field with the bag" that contained a tank of anhydrous ammonia. Newland objected, stating that what Rhodes told Kim was hearsay. In response to the objection, the State explained that the statement went to Rhodes' mental state and that it was a statement against his interest. The trial court overruled Newland's objection. The following testimony was then elicited by the State.

Q. Did he tell you what had happened in the field where the bag was hidden?

A. I don't recall, to be honest. I really don't recall to be honest with you.

Q. Okay.

A. I mean, I know that he said that *something had happened* and that he had to get the bag back because it had -- it had his name on it.

Q. Okay. He said that something had happened in the field and he had to get the bag?

A. Uh-huh.

Q. Okay.

A. Because it had his name on it.

(Emphasis added).

---

[1] Rhodes had committed suicide almost two months after the murder.

On cross-examination, Kim was asked if she and her husband went back to look for the tank after the murder of Bobby Evans. The following exchange occurred then between Kim and Newland's counsel.

Q. Okay. And do you even remember if it was after the -- the murder of Bobby Evans?

A. Yes, because he said *something had happened* and he had to get the tank because it had his name on it.

Q. Okay. But do you know if this was after the -- the murder? Did you know that that's where the -- that there had been a murder out there?

A. I don't necessarily know if it was a murder. I just know that *something had happened* because he was very adamant about going to find the tank because it had his name on it.

Q. Okay. And what he told you is that his name was on the --

A. The bag.

Q. -- the bag, correct?

A. Uh-huh.

Q. Which his name was Vernon Rhodes, correct?

A. Yes.

(Emphasis added).

Although Kim's answers which contained the statement, "something had happened" were non responsive to Newland's questions, Newland did not object.

To preserve error in admitting evidence, a party must make a proper objection and get a ruling on that objection. TEX. R. APP. P. 33.1; *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (citing *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)).

However, "[a]n error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Id*. *See also Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.").

Although Newland initially objected to the alleged hearsay statement, he elicited the same information from Kim on cross-examination. Thus, error, if any, in admitting the statement to Kim by Rhodes that "something had happened" was cured when Kim testified to the same statement without objection on cross-examination.

Accordingly, Newland's second issue is overruled.

### CONCLUSION

Having overruled each issue presented on appeal, we affirm the trial court's judgment.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed June 15, 2011
Publish
[CRPM]