**Affirmed and Opinion Filed July 17, 2024**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-22-01150-CR**

**STANLEY GERALD CHAMP, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 86th Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 19-11252-86-F**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Garcia
Opinion by Justice Partida-Kipness

Appellant Stanley Gerald Champ appeals his conviction and life sentence for continuous sexual abuse of a child. In eight appellate issues, he challenges the sufficiency of the evidence to support the verdict, the admission of extraneous offense evidence, and the constitutionality of article 38.37, section 2 of the Texas Code of Criminal Procedure. We affirm the judgment.

## BACKGROUND

The complainant, Jada,[1] moved with her family from Houston, Texas to Scurry, Texas in Kaufman County in 2005 when Jada was five years old. The purpose of the move was for the family to join the Grays Prairie Mennonite Church and its community of "plain people."[2] Jada's family met Champ and his family in early 2005 when they traveled from Houston to Scurry every two or three weeks to visit the church. During those visits, they would stay for the weekend and were housed in the church's guest trailer. After visiting over a four- or five-month period, Jada's family decided to join the church. They moved to Scurry permanently in 2005.

The first home they lived in after the move was less than a mile from Champ's home. Champ was the church janitor at that time and for most of the time Jada's family were members of the church. Champ's home was behind the guest trailer and next to the church and school. Jada's father testified that the Champs became "an extension of" their family because the Champs were the family that lived closest to

---

[1] To protect the complainant's identity, we will refer to her as Jada, which is the pseudonym used in the trial court. *See* TEX. R. APP. P. 9.10(a)(3) (sensitive data includes "the name of any person who was a minor at the time the offense was committed."); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982). Jada was between the ages of five and nine when the offenses were committed.

[2] "Plain people" are "members of any of various Protestant groups (as Mennonites) esp. in the U.S. who wear distinctively plain clothes and adhere to a simple and traditional style of life excluding many conveniences of modern technology. . . ." *Plain People*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1985); *Plain People*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981) ("members of any of various religious groups (as Mennonites, Dunkers, Amish, or Schwenkfelders) who wear plain clothes, adhere to old customs, and practice in general a simple way of life as a means of carrying out the biblical injunction not to be conformed to this world."). Jada's father described plain people as meaning "in this world but not of this world." He explained the Mennonites "uphold their own rules, but they're derived from the Bible and they become what's called 'The Discipline' and those are things which you live your life by, a little disciplinary book, the cans and can't-dos."

them, and his children befriended the Champ children. When Jada's family first moved to Scurry, they were "back and forth almost daily" to Champ's house. The children would go to Champ's house after school if Jada's mother was running errands when school let out for the day.

Jada's family moved into a new home in May 2007. According to Jada's father, between 2007 and 2011, Jada was allowed to spend the night at her friends' homes, including Champ's home. He remembers Jada spending the night at Champ's home "[l]ess than 20, more than 10" times between 2007 and 2011. During that time period, the two families would get together a couple of times a week. By 2010 or 2011, however, Jada's family attended church with the Champs but did not spend as much time with the Champ family as they had in the past.

## I.    Acts of Sexual Abuse

Jada testified her family moved to Grays Prairie because "[t]hey believed it would be a safe place to raise their children." Jada also told the jury Grays Prairie was not a safe place because "they protect predators, the church does," and Champ "sexually assaulted" her "numerous times" when she was between five and nine years old. Jada turned five on December 2, 2004, and turned nine on December 2, 2008.

Jada told the jury about seven of those assaults. First, Jada testified Champ touched her vaginal area over her dress with his hand on two occasions. The first incident was in 2005 when she was four or five years old. She did not provide a date

for the second incident. The next time she recalls an incident with Champ was in February 2007. She remembered the month because it happened on the night her mother was rushed to the hospital because of an ectopic pregnancy. Jada's father testified his wife almost died due to an ectopic pregnancy in February 2007. When she was rushed to the hospital in the middle of the night, he called Champ around 4:00 a.m. and asked him to stay in the house and get the children to church in the morning. Champ agreed to help and spent the night at Jada's home. Jada was seven years old at the time.

According to Jada, when she woke up on Sunday morning, Champ was standing in her doorway staring at her. He continued watching her when she went into the living room and then followed her into the bathroom and shut the door. He put one hand on her waist and one hand on her shoulder and pushed her to the ground. Champ then "took out his penis" and told Jada to put it in her mouth, which she did. Jada testified that while the penis was in her mouth, Champ "shoved my head on it." The assault stopped when Champ ejaculated into her hair. Jada recalled she and Champ took a shower and "then we ate Lucky Charms and went to church like nothing happened." Jada told the jury no one had ever done that to her before, and she did not know that it was not okay. In the Mennonite church, children were expected to mind the adults supervising them and "do whatever they say."

In the Fall of 2007, Champ vaginally raped Jada for the first time. She testified that she was spending the night at the Champ house on a Friday "shortly before my

8th birthday." Jada turned eight on December 2, 2007. She remembers Champ came into the bedroom where she was sleeping. He was naked and laid on top of her. Then he lifted her up, took her panties off, and penetrated her vagina with his penis. She testified it was "painful." He "moved" while he was penetrating her, and she does not remember when it stopped. She thinks Champ's daughters were in the room at that time but she "can't confirm." Jada remembered it was "very painful" afterward. But she had a bike wreck the day before, so she "chalked up all the bruising and pain to the bike ride." She also recalled "It was cool" outside the day of her bike wreck and "[t]here were brown leaves on the ground."

The "next time" Champ vaginally raped her "was a school night" when she was staying at Champ's house. When she got up in the middle of the night to get a drink of water, Champ was standing in the living room. He pulled Jada onto the couch, took both of their clothes off, pulled her onto his lap facing him, and put his penis in her vagina. She said it was "Painful but not as bad as the last time." He moved her body "back and forth" while his penis was inside of her. Jada does not remember when it stopped, but she knows she "went back to bed and I did not get a drink of water."

Jada testified about two other specific instances of vaginal rape by Champ after the first two rapes. During one incident, she was in the Champ daughters' bedroom and "woke up to it happening, and all I remember is looking at a hole in the ceiling." She said he "put his penis in her vagina" another time when she spent

the night at Champ's house. She does not recall why they were at Champ's house, but she remembers she had leaned against a heater that night and burned a hole in her jacket, and her mom was really mad.

Jada told the jury she "knew I hated it but I was told that I had to listen to the adults around me and so I thought it was just something I had to do." Also, no one ever spoke to the children about inappropriate touching in the Grays Prairie community. Jada testified Champ used his penis to penetrate her vagina on other occasions. Those "events" lasted around two years and stopped in 2009 when she was nine years old. At that time, Jada was still friends with Champ's daughters, but her family stopped seeing the Champs as often as before.

Jada's family lived in the Grays Prairie community until 2015, when they moved to another Mennonite community in Lancaster County, Pennsylvania. The family moved because of a business opportunity with a former member of the Grays Prairie community. Jada was fifteen years old when they moved to Pennsylvania. When Jada was eighteen years old, she moved with her family to another Mennonite community in Missouri. She left Missouri in March 2019 when she got married. She and her husband moved to New Holland, Pennsylvania and are no longer members of the Mennonite Church.

## II.    The Outcry and Investigation

Jada made her first outcry to her husband in April 2019, when she was nineteen years old. Jada told her mother about Champ's abuse around July 2019. Her

husband and mother encouraged Jada to go to the police, but she did not immediately do so because she "didn't want to put words to it. It would make it real." On August 19, 2019, Jada sent the following email[3] to Sheriff Bryan Beavers of the Kaufman County Sheriff's Department to report Champ and the abuse:



Jada lived in Lancaster County, Pennsylvania when she reported the abuse to the Kaufman County Sheriff's Department. Because she lived outside of the department's jurisdiction, they asked the New Holland Police Department, which is in Lancaster County, Pennsylvania, to conduct a courtesy interview of Jada. Lieutenant Detective Joshua Bitner conducted that interview on September 4, 2019.

Lieutenant Bitner testified Jada gave him details about the abuse and named Champ as the abuser. He described Jada as "emotional" during the interview and noted "it was hard for her to talk about [the abuse]." He confirmed, however, that Jada was clear Champ's abuse occurred multiple times when she was between the ages of five and nine. According to Lieutenant Bitner, Jada "spoke as if this was

---

[3] The Court has redacted sensitive information.

something that was – that was – occurred over a number of years, so that there were a number of incidents."

Lieutenant Bitner further explained "it seemed to be, a progression in the different sex acts that had occurred in the past." Jada told Lieutenant Bitner the first instance of abuse she remembered was when her mother had to go to the hospital for a difficult pregnancy. But "[s]he talked about many instances" of abuse in the Champ home, including Champ coming into the bedroom in the middle of the night and forcing her to have vaginal sex with him. Jada told Lieutenant Bitner she would focus on a hole in the ceiling when Champ was raping her "to take her mind somewhere else." Jada estimated Champ forced her to have vaginal sex with him approximately twenty times in his home in the girls' bedroom. Jada also told Lieutenant Bitner she heard a rumor around the time she and her family moved to Pennsylvania that Champ had been accused of something sexual in nature with one of his sisters.

According to Lieutenant Bitner, the interview lasted "roughly 45 to 50 minutes." He recorded the interview and sent the recording and his report to the Kaufman County Sheriff's Office. On January 31, 2020, Investigator Chad Higgins of the Kaufman County Sheriff's Office contacted him about the report. They discussed what Jada had disclosed and decided it might be beneficial to conduct a

one-party consent phone call[4] between Jada and Champ. Jada agreed to place the call and be recorded.

Under Pennsylvania law, officers must be certified to make one-party consent phone calls. Because Lieutenant Bitner was not certified, he worked with Detective Keith Neff, a certified officer from a neighboring department, to conduct the calls. Both officers were in the room with Jada when the recordings took place. On May 14, 2020, at 12:21 p.m. and 12:26 p.m., Jada placed two calls to Champ's residence. Each of those calls went to voicemail, and Jada did not leave a message. Champ's wife called the number back, stating she "just missed a call from you." She told Jada Champ was not home and works until 5 or 6 p.m. Jada asked Champ's wife to have Champ "give this number a call" when he gets home. Then, at 1:27 p.m., Jada called Champ's cell phone number. That call went to voicemail, and Jada did not leave a message.

At 1:30 p.m., Jada called Champ's cell phone number again and he answered. Jada asked Champ if he was alone and said she would like to talk to him "about some things that happened in the past that has [sic] been bothering me." Champ told Jada he did not have time to talk and asked if "it would be OK if uh one of our leaders is in on the conversation." Although Jada told him no, he insisted that he call her back. The call lasted a little over two minutes.

---

[4] A one-party consent phone call is when an individual agrees to be recorded when she calls another individual who is not aware the call is being recorded.

–9–

Champ called Jada back before 2:00 p.m. The call began with Champ stating he was at the house with his wife and would like her to listen in. He then asked if there was anyone with Jada on her end, to which she said no. Champ also asked if the conversation was being recorded, and Jada said no. Champ also confirmed he and his wife were not recording the conversation. Jada then stated she wants "to move on" and wants to know "why he did some of the things he did." Champ responded by asking "What are you referring to?" and asking Jada to be specific. Jada replied that Champ touched her once in his daughter's bedroom. Champ responded:

> I do not have an answer for that question at this time. Because I need more. I need advice to know how to handle this situation. I'm not trying to put you off or to snub you. But due to the implications of something of that nature, I feel like it would be better for me to have some counsel in working through that.

When Jada stated again that she just wanted answers from him, he responded "I can understand. Well, maybe I shouldn't say that. I don't know how to relate this [Jada] and that's why I feel I need counsel myself." When Jada asked if he was admitting the allegation, Champ replied that he had no comment and again stated he "needed advice on how to handle these questions because I look at them in a very serious light [Jada]." During the twenty-minute call, Champ reiterated that he did not have answers to her questions at that point and felt he needed more advice on how to handle this before he could give any answers "on so serious a matter." Champ

assured Jada he would get back in touch with her after he spoke to his ministry leaders. He indicated he might also seek legal counsel.

Jada called Champ again on May 16, 2020, at 2:20 p.m. Their conversation lasted more than twenty-six minutes. After answering the phone, Champ told Jada his wife was there with him and then the following exchange occurred:

> Champ: "In response to your questions the other day, I can honestly say I was not involved in any inappropriate activity with you."
>
> Jada: "That's what your legal advice told you to say?"
>
> Champ: "That's what I am saying. I believe that to be true and in light of that I feel that any further questions or discussions related to uh those those issues, or this issue would – would be irrelevant."
>
> Jada: "But what you're saying isn't true. You said you believe you didn't do it, but what does that mean?"
>
> Champ: "Like I said, I can honestly say I was not involved in any inappropriate activity with you."
>
> Jada: "You – you know what happened. I mean. I don't understand why you are lying about it."
>
> Champ: "Who said I'm lying?
>
> Jada: "I did because I know what happened. And you know what happened too. Did the bishop tell you to lie about what happened?"
>
> Champ: "No."
>
> Jada: "Did your preacher tell you to lie?"
>
> Champ: "No. This. I believe this to be the honest truth and I have no further comments [Jada]. I don't understand. Well, that, I'll stop with that. I don't have any further comment. Like I said, I believe what I stated is true and I do not have, in light of that statement I do not have any further answers."

The remainder of the twenty-six-minute call consisted of variations of Jada asking why he did it, and Champ repeating he was not involved in any inappropriate activity with her. When Jada asked several times if he was calling her a liar, Champ responded that he was not calling her a liar and was not saying she was lying, but he "was not involved in any inappropriate activity." Toward the end of the call, Jada told Champ to "stop saying inappropriate activity. Let's just call it what it is. I mean you touched me and you know it. Stop playing games with words." In response, Champ stated "I was not involved in any inappropriate activity [Jada]. Which includes sexual activity."

Lieutenant Bitner's testimony continued after the jury heard the call recordings. He described the tone of the calls on May 14th and May 16th as "very different." He found it significant in the first call that Champ did not deny any wrongdoing. Champ didn't say "I didn't do this or whatever it is that you think I did, I didn't do it." As for the May 16, 2020, call, Lieutenant Bitner testified that Champ's answers "seemed very scripted" because Champ "would repeat the same thing over and over again, and that was that he can honestly say that he was not involved with inappropriate activity."

Jada told the jury Champ's statements during the calls made her "angry." Champ's desire to talk to someone from the church also angered her because she "thought the church would just cover for him again."

After receiving Lieutenant Bitner's investigation materials from the New Holland Police Department, including the recordings of the one-party consent calls, Investigator Higgins called Champ multiple times to set up an interview so he could get Champ's side of the story. Champ's counsel returned those calls and stated Champ was unavailable for an interview. Inspector Higgins then prepared the case and submitted it to the district attorney's office to be presented to the grand jury.

## III.   Trial

On May 7, 2021, the State indicted Champ for continuous sexual abuse of a child under the age of fourteen by intentionally and knowingly causing the penetration of the sexual organ of Jada by Champ's sexual organ. TEX. PENAL CODE § 21.02. The case proceeded to trial before a jury on August 29, 2022. After a four-day trial, the jury found Champ guilty as charged in the indictment and assessed punishment at life imprisonment. The trial court rendered judgment on the verdict on September 1, 2022. Champ filed a Motion for New Trial and Motion for Arrest of Judgment, which the trial court denied. This appeal followed.

### ANALYSIS

In eight issues, Champ challenges the sufficiency of the evidence to support the conviction, the admission of extraneous offense evidence, and the constitutionality of TEX. CODE CRIM. PROC. Art. 38.37, § 2. We overrule each issue and affirm the judgment.

## I.  Sufficiency of the Evidence

In his first two issues, Champ challenges the sufficiency of the evidence to support the conviction. He maintains the evidence was legally insufficient to establish (1) that two or more underlying acts of sexual abuse occurred after the effective date of the statute (September 1, 2007), and (2) a 30-day interval between the acts such that the acts occurred over a period of 30 or more days. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. Applying these standards here, we conclude the evidence was legally sufficient to support the conviction.

### A.  Two or more underlying acts occurred after September 1, 2007

The statute prohibiting continuous sexual abuse of a young child became effective on September 1, 2007. Act of May 18, 2007, 80th Leg., R.S., ch. 593, §§ 1.17, 4.01(a), 2007 TEX. GEN. LAWS 1120, 1127, 1148 (codified at TEX. PENAL CODE § 21.02). The statute does not apply to acts of sexual abuse committed before that date. *Smith v. State*, No. 05-16-01318-CR, 2018 WL 3424388, at *4 (Tex. App.—Dallas July 16, 2018, no pet.) (mem. op., not designated for publication) (citing *Gomez v. State*, 459 S.W.3d 651, 660 (Tex. App.—Tyler 2015, pet. ref'd)). A person

–14–

commits the offense of continuous sexual abuse of a child if, during a period that is thirty days or more in duration, "the person commits two or more acts of sexual abuse . . . and, at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age. . . ." TEX. PENAL CODE § 21.02(b). It is well established the testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child. TEX. CODE CRIM. PROC. art. 38.07; *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.). Corroboration of the child victim's testimony by medical or physical evidence is unnecessary. *Turner v. State*, 573 S.W.3d 455, 459 (Tex. App.—Amarillo 2019, no pet.).

Here, Jada testified to four specific instances of being vaginally raped by Champ. The first of those rapes occurred "shortly before her eighth birthday" when the weather was cool and there were brown leaves on the ground. She turned eight on December 2, 2007. She described that incident in response to the prosecutor asking Jada to tell her "about the next time" she remembered Champ doing something to her after he forced his penis in Jada's mouth in February 2007. On cross-examination, Champ's counsel questioned Jada further about when the first rape occurred. Jada testified it happened "around" her eighth birthday and "around October" because "[t]here were leaves on the ground and there were no leaves on the trees." She also agreed it was possible the first rape happened in September 2007

–15–

or November 2007. There is no evidence, however, the incident occurred before September 1, 2007.

After describing the first rape to the jury, Jada testified Champ used his penis to penetrate her vagina other times for about two years:

Q. Jada, were there other times that the defendant used his penis to penetrate your vagina?

A. Yes, ma'am.

Q. How long did that last, different events of him penetrating your vagina with his penis?

A. Around two years.

Q. How old were you when that stopped?

A. Nine.

Q. Can you tell us about the next time that you remember him doing something like that?

Jada responded by describing the time Champ forced her onto his lap on the living room couch and raped her. Next, Jada testified about waking up to Champ raping her and remembering she looked at the hole in the ceiling while it happened. She did not tie that rape to a specific date or time of year. However, she indicated the fourth rape happened during winter because she remembers leaning up against a heater at Champ's house and burning a hole in her jacket the night the incident occurred. Jada turned nine on December 2, 2008. She testified the abuse stopped in 2009 when she was nine years old.

Jada's testimony at trial concerning the four rapes and when they occurred was consistent with how she described those acts to Lieutenant Bitner. He testified the first instance of abuse Jada vividly remembered was the February 2007 incident. She also told Lieutenant Bitner "about many instances" of abuse that occurred in the Champ home. During cross-examination, Champ's counsel elicited testimony from Lieutenant Bitner confirming Champ forced Jada to have vaginal sex with him in the middle of the night in his daughters' bedroom on more than one occasion:

> Q. Did she tell you about another incident that happened in the Champ home?
>
> A. She talked about many instances.
>
> Q. Okay. Did she tell you that Champ would come into the bedroom in the middle of the night and force Jada to have vaginal sex with him?
>
> A. She did.
>
> Q. Did she tell you that she would often focus on a hole that was in the ceiling when Champ was having sex with her?
>
> A. Yes. She had said that she would focus on this sort of in a way to take her mind somewhere else.

When Inspector Higgins searched Champ's house, he took photos of a hole in the ceiling of the room where Jada said the rapes occurred.

As discussed above, the testimony of a victim alone, even if that victim is a child, is sufficient to support a conviction for continuous sexual abuse of a child. TEX. CODE CRIM. PROC. art. 38.07(a); *Garner*, 523 S.W.3d at 271. Jada's testimony that Champ vaginally raped her with his penis at least four times and her description of that abuse was unequivocal, detailed, and sufficient to support the conviction. *See,*

*e.g.*, *Rodriguez v. State*, No. 05-18-01448-CR, 2020 WL 881008, at *4 (Tex. App.—Dallas Feb. 24, 2020, no pet.) (mem. op., not designated for publication) (evidence legally sufficient where victim testified to facts of offense even though she was imprecise about times and dates and there was no corroborating evidence); *see also Denver v. State*, No. 05-14-00817-CR, 2016 WL 661034, at *6 (Tex. App.—Dallas Feb. 18, 2016, pet. ref'd) (mem. op., not designation for publication) ("The child's testimony was neither suspect nor inherently unconvicting, and was alone sufficient to support appellant's convictions."). Her testimony concerning when the first vaginal rape occurred was also unequivocal and consistent with what she told Lieutenant Bitner. Even on cross-examination, Jada consistently testified the first vaginal rape occurred in the Fall of 2007, around her eighth birthday, and when the trees had already lost their leaves. She then described three additional acts of Champ penetrating her vagina with his penis after the first time. When considering all of the evidence in its totality and in the light most favorable to the verdict, a rational fact finder could have found, beyond a reasonable doubt, that Champ committed at least two acts of sexual abuse after September 1, 2007. *See Jackson*, 443 U.S. at 318–19; *see also* TEX. PENAL CODE § 21.02. Indeed, by returning a guilty verdict, we must infer the jury believed Jada's testimony about Champ's sexual abuse. *See Perez v. State*, No. 05-19-01225-CR, 2021 WL 869636, at *5 (Tex. App.—Dallas Mar. 9, 2021, no pet.) (mem. op., not designated for publication). We defer to that

determination. *See id.* (first citing *Jackson*, 443 U.S. at 318–19; and then citing *Rodriguez*, 2020 WL 881008, at *3).

## B.     The acts occurred over a period of thirty or more days

Champ also argues the evidence was insufficient to prove the acts occurred over a period of thirty or more days. Here, the indictment alleged two or more acts of sexual abuse occurred "during a period that was 30 or more days in duration, namely from on or about September 1, 2007 through on or about December 22, 2008 [.]" The "on or about" language of an indictment "allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). The indictment was signed May 7, 2021, after the offenses occurred, and there is no statute of limitations for the offense of continuous sexual abuse of a child. TEX. CODE CRIM. PROC. art. 12.01(1)(D); *see Baez v. State*, 486 S.W.3d 592, 595 (Tex. App.—San Antonio 2016, pet. ref'd).

When examining continuous sexual abuse of a child, the State is not required to prove exact dates, but rather that two or more acts of sexual abuse occurred over a period of thirty or more days. TEX. PENAL CODE § 21.02(d); *Montero v. State*, No. 05-18-01281-CR, 2019 WL 3229170, at *1 (Tex. App.—Dallas July 18, 2019, no pet.) (mem. op., not designated for publication) (first citing *Baez*, 486 S.W.3d at 595; and then citing *Buxton v. State*, 526 S.W.3d 666, 676 (Tex. App.—Houston [1st

–19–

Dist.] 2017, pet. ref'd)). Similarly, "child victims are not required to be specific about the dates the abuse occurred." *Montero*, 2019 WL 3229170, at *2 (first citing *Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006); and then citing *Vasquez v. State*, Nos. 05-12-00548-49-CR, 2013 WL 5614300, at *5 (Tex. App.— Dallas Oct. 14, 2013, no pet.) (mem. op., not designated for publication)). Further, jury members are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. TEX. PENAL CODE § 21.02(d); *Aguilar v. State*, No. 04-14-00532-CR, 2015 WL 4638096, at *2 (Tex. App.—San Antonio July 15, 2015, pet. ref'd) (mem. op., not designated for publication). Instead, the jury must only agree unanimously that the defendant, over a period of 30 or more days, committed two or more acts of sexual abuse. TEX. PENAL CODE § 21.02(d).

Although Jada did not provide specific dates as to when the many instances of sexual abuse occurred, the jury could have found from the facts presented that those acts of sexual abuse began no earlier than September 1, 2007, and continued until sometime in 2009, a period of time in excess of thirty days in duration. *See, e.g.*, *Tucker v. State*, No. 05-19-01515-CR, 2022 WL 1564554, at *4–5 (Tex. App.— Dallas May 18, 2022, pet. ref'd) (mem. op., not designated for publication) ("The span of time described by K.T. (e.g., every 'couple weeks,' 'middle school,' 'pretty regularly,' or '6th to 7th grade') necessarily involves a period that is thirty days or more in duration."); *see also Aguilar*, 2015 WL 4638096, at *3 (testimony that

–20–

sexual abuse started sometime in 2008 and stopped sometime in early 2010, and more than two acts of sexual abuse occurred during that time was sufficient to support finding the abuse occurred during a period in excess of thirty days in duration). The evidence and reasonable inferences from it showed the first act of vaginal penetration occurred in Fall 2007, and additional incidents of vaginal penetration occurred after the first act and continued occurring until 2009 after her ninth birthday on December 2, 2008. If the jury accepted Jada's testimony, as it apparently did, then it could have found from the evidence that Jada had described at least two acts of abuse that occurred more than thirty days apart. *See Tucker*, 2022 WL 1564554, at *4–5; *see also Brown v. State*, No. 05-19-00597-CR, 2020 WL 4034964, at *6 (Tex. App.—Dallas July 17, 2020, no pet.) (mem. op., not designated for publication) (testimony that the two acts occurred about a year apart, with one act occurring when complainant was in fourth grade and the other occurring when she was in fifth grade was sufficient evidence the two acts took place thirty or more days apart); *GonzalezCastillo v. State*, No. 02-22-00156-CR, 2023 WL 5115535, at *5–6 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op., not designated for publication) (testimony that sexual abuse occurred on at least ten occasions when complainant was between four and seven years old with other references to timeframes was sufficient to support finding appellant committed at least two acts of sexual abuse thirty or more days apart); *Aguilar*, 2015 WL 4638096, at *3.

The jury could also consider Champ's regular access to Jada between 2007 and 2009. According to Jada's father, between 2007 and 2011, Jada was allowed to spend the night at her friends' homes, and he recalled Jada spent the night at the Champs's home between ten and twenty times. The two families would also get together a couple of times a week during that time. It was not until 2010 or 2011, after the abuse stopped, that the two families no longer spent as much time together. Champ's regular access to Jada further supports the jury's finding that the acts of sexual abuse took place more than thirty days apart. *See Blunt v. State*, No. 05-19-00216-CR, 2020 WL 1672552, at *2 (Tex. App.—Dallas Apr. 6, 2020, no pet.) (mem. op., not designated for publication) (jury could consider the defendant's periodic access to the victim during the relevant time); *see also Williams v. State*, 305 S.W.3d 886, 890 (Tex. App.—Texarkana 2010, no pet.) (evidence showed defendant had access to victim during the time period listed in indictment).

Viewing the evidence in the light most favorable to the verdict and reasonable inferences from it, we conclude a rational fact finder could have found, beyond a reasonable doubt, that two or more acts occurred over a period of thirty or more days after September 1, 2007. We overrule Champ's first and second issues.

## II.	Evidence of Extraneous Offenses

Champ asserts five issues in which he complains of the admission of evidence concerning extraneous offenses. The evidence at issue consisted of testimony concerning extraneous acts of sexual abuse committed against Jada before

September 1, 2007, against Champ's sister, E.M., in the early 1990s and early 2000s, and against his infant daughters. Champ maintains this evidence should have been excluded under Rule 403. TEX. R. EVID. 403. Champ also argues the trial court refused to conduct the necessary Rule 403 balancing test as to the extraneous offenses committed against Jada.

## A.     Standard of review and applicable law

We review a trial court's ruling on the admissibility of evidence, including evidence of extraneous offenses, for an abuse of discretion. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). If the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). This is because trial courts are usually in the best position to make the determination as to whether certain evidence should be admitted or excluded. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).

### 1.     Admissibility under Article 38.37

Article 38.37 of the code of criminal procedure permits the introduction of evidence of extraneous offenses or acts in certain types of sexual abuse cases, including cases in which the defendant is charged with continuous sexual abuse of a child under the age of fourteen. TEX. CODE CRIM. PROC. art. 38.37, § 1(a)(1)(A). In such cases, "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the

–23–

child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child." *Id.* § 1(b). Article 38.37 was amended in 2013 to add section 2, which allows, again notwithstanding rules 404 and 405, evidence of certain extraneous offenses committed by the defendant against a third person. *Id.* § 2(b). Section 2(b) allows the admission of such evidence "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." *Id.* Before evidence described by Section 2 may be introduced, however, the trial court must hold a hearing outside the presence of the jury and make a finding that "the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt[.]" *Id.* § 2–a.

### 2. Rule 403 objections and balancing test

Evidence admissible under article 38.37 is subject to Rule 403's balancing test. *Keller v. State*, 604 S.W.3d 214, 228 (Tex. App.—Dallas 2020, pet. ref'd). Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. But Rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear on the credibility of either the

–24–

defendant or complainant in 'he said, she said' cases." *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009). Rule 403 "envisions exclusion of evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Id.* at 568 (quoting *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992)). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). Indeed, "all evidence against a defendant is, by its very nature, designed to be prejudicial." *Id.* This Court will reverse a trial court's determination under Rule 403 "rarely and only after a clear abuse of discretion," recognizing the trial court is in a superior position to gauge the impact of the evidence. *Perkins v. State*, 664 S.W.3d 209, 217 (Tex. Crim. App. 2022).

When evidence of a defendant's extraneous acts is relevant under article 38.37, the trial court is required, on proper objection or request, to conduct a rule 403 balancing test. *Keller*, 604 S.W.3d at 228. When a trial court conducts a Rule 403 balancing test, it "must balance" the following:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (the *Gigliobianco* factors). In any given case, "these factors may well blend together in practice." *Id.* at 642.

### B.    Rule 403 balancing test

Champ first argues the trial court refused to conduct a Rule 403 balancing test following his objection to the extraneous offense evidence. Before the State's direct examination of Jada, the following exchange occurred outside the presence of the jury:

> THE STATE: Your Honor, pursuant to 38.37, defense counsel did request a 38.37 notice 30 days prior of any acts outside the indictment and we did tender -- pursuant to 38.37 -- notice of those acts 30 days prior to our trial date as it relates to the victim in this case, Jada, and that is who we intend to call next.

> DEFENSE COUNSEL: Your Honor, if I may, I would like to object to any evidence the State intends to offer with respect to extraneous matters, those being outside the indictment and not alleged in the indictment. Under Rule 404, 405, additionally under Rule 403, any probative value obviously is outweighed by the prejudicial nature of those -- those types of allegations.

> There is one late notice that we received, Your Honor, and I've been led to believe by the State in an e-mail I received that that would not be an allegation that they would inquire into and -- in this trial. With that, I'd ask the Court to note our objections and in the event the Court is going to allow the testimony, we'd like to have a running objection to any matters not alleged in the indictment.

The trial court granted the request for a running objection. In response, the State argued the extraneous offenses committed against Jada, including acts not included in the indictment, are admissible under article 38.37 because the State provided the

defense the required statutory notice. Champ's counsel agreed he received the 38.37

notice, but maintained acts alleged to have occurred before September 1, 2007, are

inadmissible:

> DEFENSE COUNSEL: In addition, Your Honor, I've – I'm also aware that there are acts alleged that take place outside of the statutory authority that this Court has with respect to predicate acts that have taken place prior to September 1st, 2007. I assume the State may intend to offer that evidence and if, in fact, they do, we would object to it further, Your Honor, as evidence that's outside the scope of the statute and shouldn't be brought in front of the jury.

The State reiterated its intention to ask Jada about abuse she suffered at the hands of

Champ between the ages of five and nine and confirmed the State provided Champ

with the required statutory notice thirty days before trial. In response, Champ's

counsel reiterated his objection to conduct occurring before September 1, 2007:

> DEFENSE COUNSEL: Judge, it's conduct that the State may attempt to show before the jury that would have occurred prior to September the 1st, 2007, which I don't believe is -- is appropriate to be offered in support of this indictment. And the fact that the statute was not in effect, this Court doesn't have jurisdiction to allow this jury to consider that information for purposes of supporting the indictment.
>
> The Court notes that I previously filed a motion to quash the indictment and I would assert those same claims we made in that prior motion with respect to the indictment and any evidence that's being offered in support of this.

The trial court then ruled on the objection as follows:

> THE COURT: Anything that obviously comports with 38.37 that notice was given that I have not specifically excluded already, which I guess was just the one that was given last week, other than that, as long as 30 days notice was given, the notice was done, then obviously it will be allowed. I don't see any other hurdles other than that, but if it goes beyond that [counsel], then you can renew your objection.

–27–

DEFENSE COUNSEL: I will, Your Honor.

Champ cites the trial court's ruling as evidence the court did not conduct a Rule 403 balancing test as to the admissibility of evidence of extraneous acts of sexual abuse against Jada and Champ's sister, E.M., occurring before September 1, 2007. We disagree.

When evidence of a defendant's extraneous acts is relevant under article 38.37, the trial court is required, on proper objection or request, to conduct a rule 403 balancing test. *Keller*, 604 S.W.3d at 228. Absent an explicit refusal to conduct the balancing test, we presume the trial court conducted the test when it overruled the objection. *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997) (appellate courts presume trial court engaged in required balancing test once rule 403 is invoked, and the trial court's failure to conduct balancing test on record does not imply otherwise); *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd) (Rule 403 does not require the balancing analysis be performed on the record). Moreover, when Rule 403 has been invoked, we presume the trial court engaged in the balancing test, even when the record is silent on the subject. *Williams*, 958 S.W.2d at 195–96.

Champ has not identified, and we have not found, anything in the record that overcomes the presumption the trial court engaged in the Rule 403 balancing test. On the contrary, the trial judge ruled the evidence was relevant under article 38.37 and stated, "I don't see any other hurdles other than that, but if it goes beyond that

that [counsel], then you can renew your objection." The only other "hurdle" asserted by Champ's counsel was the Rule 403 objection. The trial judge ruled, at least impliedly, that Rule 403 was not a hurdle to admission of the challenged testimony. Under this record, we conclude the trial court engaged in the Rule 403 balancing test.

Moreover, as we will discuss below, the trial court's alleged explicit refusal to conduct the Rule 403 balancing test did not affect Champ's substantial rights. TEX. R. APP. P. 44.2(b). The court's error, if any, could not have improperly influenced the jury's verdict because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Daraghmeh v. State*, No. 05-13-01127-CR, 2014 WL 7269924, at *5 (Tex. App.—Dallas Dec. 22, 2014, no pet.) (mem. op., not designated for publication); *see also Colvin v. State*, 54 S.W.3d 82, 85–86 (Tex. App.—Texarkana 2001, no pet.) (applying rule 403 balancing test and concluding that trial court's failure to conduct the balancing test did not affect the appellant's substantial rights); *Flores v. State*, 840 S.W.2d 753, 756 (Tex. App.—El Paso 1992, no pet.) (applying former rule 81(b)(2) and concluding, beyond a reasonable doubt, that error in admission of extraneous offense evidence in absence of a balancing test did not contribute to the conviction, nor did it contribute to the punishment). We overrule Champ's third issue.

### C. Evidence of extraneous offenses committed against Jada before September 1, 2007

In his fourth issue, Champ complains of the admission of Jada's testimony concerning acts of sexual abuse against her occurring before September 1, 2007. The extraneous acts included Jada's allegations Champ touched her genital area over her dress twice beginning in 2005 and forced her to engage in oral sex in February 2007 the night her mother was rushed to the hospital. The State contends Champ failed to preserve error because Lieutenant Bitner testified to those extraneous acts without objection. Champ contends the failure to object did not waive error because Lieutenant Bitner's testimony was too general to warrant objection. We agree with the State.

"As a prerequisite to presenting a complaint on appeal, a party must have made a timely and specific request, objection, or motion to the trial court." *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (citing TEX. R. APP. P. 31(a)(1)(A)). "An objection is timely if it is made as soon as the ground for the objection becomes apparent, i.e., as soon as the defense knows or should know that an error has occurred." *Id.* (citing *Neal v. State*, 256 S.W.3d 264, 279 (Tex. Crim. App. 2008)). "Generally, this occurs when the evidence is admitted." *Id.* (citing *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995)). "If a party fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived." *Id.* (citing *Dinkins*, 894 S.W.2d at 355). Moreover, "[a]n error [if any] in

the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Newland v. State*, 363 S.W.3d 205, 210 (Tex. App.—Waco 2011, pet. ref'd) (alterations in original) (quoting *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004); and then citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.")))).

Here, Champ's counsel elicited testimony concerning the extraneous offenses committed against Jada. Lieutenant Bitner testified before Jada at trial. During his cross examination, Champ's counsel spent three minutes asking Lieutenant Bitner questions concerning what Jada told him about the abuse during his interview of her. In response, Lieutenant Bitner confirmed Jada told him Champ's abuse occurred when Jada was between the ages of five and nine, and the first instance she remembered was when her mother had to go to the hospital for a difficult pregnancy. Lieutenant Bitner also testified, in response to the questions of Champ's counsel, that Jada "talked about many instances" of abuse in the Champ home, and she "spoke as if this was something that was – that was – occurred over a number of years, so that there were a number of incidents." During the State's redirect examination of Lieutenant Bitner, he reiterated that Jada detailed abuse occurring between the ages of five and nine, she described "a progression in the different sex acts that had

–31–

occurred in the past," and was clear the abuse was over the course of those years and happened multiple times. Champ did not object to this testimony.

The evidence Champ now challenges as improperly admitted merely provided more detail of the unobjected-to testimony elicited from Lieutenant Bitner by Champ's counsel. Jada's subsequent testimony did not raise any additional extraneous offenses. Because Champ failed to object to the testimony regarding the extraneous offenses when it was first offered, we find Champ's objection to Jada's later testimony was untimely and, thus, he failed to preserve error. *See Evans v. State*, No. 06-16-00064-CR, 2017 WL 1089806, at *8–9 (Tex. App.—Texarkana Mar. 22, 2017, pet. ref'd) (mem. op., not designated for publication) (failure to object to general testimony concerning extraneous offenses when first offered waived challenge to more detailed testimony admitted later).

Even if we were to assume Champ preserved this error for our review, we find no abuse of discretion in the trial court's evaluation of the balance between the probative and prejudicial natures of the challenged testimony and conclude the *Gigliobianco* factors favor admission of the evidence. *Gigliobianco*, 210 S.W.3d at 641–42.

Evidence of the first three acts of sexual abuse committed against Jada was probative of the state of mind of both Champ and Jada, and probative of Champ's previous and subsequent relationship with Jada. That evidence was, therefore, relevant under article 38.37 and favors admission. *See* TEX. CODE CRIM. PROC. art.

38.37, §1(b). Because those acts were the preliminary acts that lead up to the charged offense, the evidence was relevant to the jury's understanding of the events. *See McCoy v. State*, 10 S.W.3d 50, 55 (Tex. App.—Amarillo 1999, no pet.). Further, the extraneous offense evidence was offered to support a disputed fact: whether Champ committed acts of sexual abuse against Jada. At trial, Champ argued Jada lied about her interactions with Champ. Evidence of his extraneous acts against Jada were, therefore, probative to rebut Champ's theory of the case. *See Ryder v. State*, 581 S.W.3d 439, 453–54 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.—Houston [1st Dist.] 2017, no pet.). We conclude the first factor weighs in favor of admission.

The second factor, the State's need for the evidence, also favors admission. By adopting article 38.37, section 2, the legislature recognized in child sex offenses, "there is typically very little evidence to assist prosecutors with proving their cases." *Bradshaw v. State*, 466 S.W.3d 875, 884 (Tex. App.—Texarkana 2015, pet. ref'd). (quoting Senate Comm. on Criminal Justice, Bill Analysis, Tex. S.B. 12, 83d Leg., R.S. (2013)). In these situations, courts routinely conclude the second factor weighs in favor of the State. *Chatley v. State*, No. 05-23-00306-CR, 2024 WL 1363973, at *12 (Tex. App.—Dallas Apr. 1, 2024, pet. filed) (mem. op., not designated for publication) (collecting cases). In a "he said, she said" case involving sexual abuse, rule 403 should be used "sparingly" to exclude relevant, otherwise admissible evidence that might bear on the credibility of the defendant or complainant.

*Landaverde v. State*, No. 05-19-00175-CR, 2020 WL 2897108, at *5 (Tex. App.—Dallas June 3, 2020, pet. ref'd) (quoting *Hammer*, 296 S.W.3d at 562). Here, the only direct evidence the State had of Champ committing acts of sexual abuse against Jada was Jada's testimony, and Champ denied committing the acts. The evidence provided context about the nature of Champ's abuse of Jada. The evidence also showed the abuse progressed in severity over time, which is consistent with how perpetrators of sexual abuse against children typically behave and consistent with expert testimony presented by the State at trial. We conclude the State's need for the evidence was strong and, therefore, the second factor weighs in favor of admission. *See Lane v. State*, 933 S.W.2d 504, 521 (Tex. Crim. App. 1996) (the need for extraneous offense evidence is greatest when the evidence supported an element of a "hotly contested issue"); *see also Chatley*, 2024 WL 1363973, at *12 (second factor favors admission of extraneous offense evidence in "he said, she said" cases).

As for the third factor, we recognize that evidence of previous child sexual abuse is inherently inflammatory by nature and, hence, can be prejudicial. *Miller v. State*, No. 05-22-01309-CR, 2024 WL 322265, at *4–5 (Tex. App.—Dallas Jan. 29, 2024, no pet.) (mem. op., not designated for publication) (first citing *Pawlak*, 420 S.W.3d at 809; and then citing *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd)); *Dies v. State*, 649 S.W.3d 273, 285–87 (Tex. App.—Dallas 2022, pet. ref'd). Here, any potential risk was diminished because the extraneous offenses against Jada involved no vaginal penetration and were, thus, less severe

than the charged acts. Moreover, the jury charge instructed the jury that it could not convict Champ based upon acts occurring before September 1, 2007. We presume the jury followed that instruction. *See Dies*, 649 S.W.3d at 287; *see also Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd) (citing *Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003)). We conclude the third factor only weighs slightly against admission.

Under the fourth factor, we consider if the evidence had any tendency to confuse or distract the jury from the main issues at trial. Here, the main issue in the case was whether Champ committed the offense against Jada as alleged in the indictment. The trial court mitigated the tendency of the extraneous offense evidence to confuse or distract the jury from that issue by including the following limiting instruction concerning extraneous offense evidence:

> The State may have introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. You cannot consider the evidence of extraneous crimes or bad acts for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such extraneous crimes or bad acts, and even then you may only consider the same in determining the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, and for no other purpose.

The jury is presumed to have followed the court's instruction. *Resendiz*, 112 S.W.3d at 546; *Dies*, 649 S.W.3d at 287. Therefore, this factor weighs in favor of admission.

The fifth factor refers to evidence such as highly technical or scientific evidence that might mislead the jury because it is not equipped to weigh the probative force of the evidence. *Dies*, 649 S.W.3d at 287; *Gigliobianco*, 210 S.W.3d

at 641 (this factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence."). The evidence in question here was neither scientific nor technical in nature, and it pertained to matters, including victim credibility, that could easily be understood by a jury. We conclude the fifth factor weighs in favor of admission.

Finally, the sixth factor favors admission because presenting the evidence did not take an inordinate amount of time or repeat already admitted evidence. Jada's direct examination was forty pages long, only eight of which included her description of the first three instances of abuse. Moreover, although Jada provided a more detailed description of the extraneous offenses than Lieutenant Bitner, her testimony was not repetitive and was an important component of the State's case. Thus, this factor also weighs in favor of admission. *See*, *e.g.*, *Gaytan*, 331 S.W.3d at 228 (disputed testimony was thirteen pages out of a 200-page trial transcript, and it was not repetitive of other evidence); *see also Kimberlin v. State*, No. 05-18-00018-CR, 2019 WL 1292471, at * 4 (Tex. App.—Dallas Mar. 21, 2019, no pet.) (mem. op., not designated for publication) (comprising thirty-two pages of two volume reporter's record).

We conclude the trial court, after balancing the rule 403 factors, could have reasonably concluded the probative value of the evidence in question was not

substantially outweighed by the danger of unfair prejudice and the other rule 403 factors. Accordingly, the trial court did not abuse its discretion in admitting the extraneous offense evidence and admission of the evidence did not affect Champ's substantial rights. We overrule Champ's fourth issue.

### D. Evidence of extraneous offenses committed against Champ's sister, E.M.

Champ's biological sister, E.M.,[5] testified to alleged abuse by Champ when she was between the ages of three and five and again when she was thirteen or fourteen years old. In his fifth issue, Champ challenges the admission of that evidence under Rule 403. Before addressing the merits of this issue, we must first determine if Champ preserved error. The State contends Champ failed to timely preserve error because he failed to object to Lieutenant Bitner's testimony concerning the offenses against E.M. Champ maintains he preserved error by objecting at trial "to any evidence the State intends to offer with respect to extraneous matters" under Rules of Evidence 403, 404, and 405. We agree with the State.

To preserve error for appeal, a party must make a timely objection, stating the grounds for the objection and obtain a ruling from the trial judge. TEX. R. APP. P. 33.1(a). The objection on which Champ relies was made immediately before Jada's testimony in response to the State informing the trial court that it intended to call

---

[5] This witness was a minor at the time the alleged offenses were committed against her. To protect her identity, we will refer to her as E.M. *See* TEX. R. APP. P. 9.10(a)(3).

Jada as the next witness and to offer evidence of acts outside of the indictment "as it relates to the victim in this case, Jada." The discussion on the record between counsel and the trial court was limited to the extraneous offenses committed against Jada before September 1, 2007. Champ did not explicitly reference the extraneous offenses related to E.M., nor did he ask for a ruling as to the E.M.-related evidence or obtain such a ruling.

Moreover, Champ's objection came after his counsel elicited testimony from Lieutenant Bitner about allegations Champ had sexually assaulted another victim:

> Q. (BY DEFENSE COUNSEL) Is it true, Officer, that Jada had told you about some rumors she had heard about Mr. Champ and some other sexual assault situation?
>
> A. She had mentioned a rumor that there was something sexual in nature that may have been alleged.
>
> Q. Did she tell you that was in the year 2015?
>
> A. I can't recall if she said exactly the year 2015. I think she said it would have been about that would have been 15 years of age.
>
> Q. Did she tell you it was after her family had moved to Pennsylvania?
>
> A. I think she had become aware of it around the time that she had moved away.

On redirect by the State, Lieutenant Bitner confirmed Jada did not give him the specific name of the rumored victim but told him the victim was Champ's sister. Champ's counsel did not object to this testimony and asked Lieutenant Bitner additional questions about the rumor during his re-cross examination. Bitner confirmed Jada said she had learned of the alleged sexual assault in 2015 around the

–38–

time she and her family moved to Pennsylvania. Similarly, Champ did not object when Investigator Higgins later testified that he was familiar with E.M. because when he was assigned to Jada's case, he conducted a search in the department's reporting system and saw a 2016 report listing Champ as an offender and Champ's sister, E.M., listed as the victim. Further, Champ did not raise a Rule 403 objection when E.M. testified at trial. We conclude Champ did not preserve a Rule 403 challenge to the evidence of extraneous offenses committed against E.M.

Even if we assumed Champ preserved this error for our review, we would still conclude the trial court did not abuse its discretion by admitting the evidence. E.M. was born in 1987 and is seventeen years younger than Champ. She testified Champ sexually abused her between 1990 and 1992 when she was between three and five years old. E.M. described multiple acts of sexual abuse committed by Champ during those years. Those acts included Champ touching her genitals under her clothing, forcing her to perform oral sex on him, making her touch his penis and help him ejaculate, and putting his penis in her vagina. During one of those incidents, Champ picked her up and forced her vagina "down on his penis." She recalls other people being in the house when some of the incidents occurred. She also testified Champ told her that he would kill her pets if she made a noise or told anyone. E.M. told the jury she does not know how many times Champ abused her because she "quit counting when I got to 20." E.M. alleged the abuse stopped when Champ got married and moved out of the family home but occurred again in the early 2000s when she

was between thirteen and fifteen years old. During that time, Champ forced her to perform oral sex on him. E.M. made her initial outcry in 2015 when she was twenty-eight years old.

Champ contends the trial court abused its discretion by concluding the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. He maintains the testimony had minimal probative value, which was compounded by the remoteness of the alleged acts. Champ further argues admission of E.M.'s testimony was an abuse of discretion because the State presented no evidence of any intervening conduct in the thirty years between the alleged abuse of E.M. and the alleged acts against Jada for which he was indicted. Applying the *Gigliobianco* factors, we conclude the trial court did not abuse its discretion by admitting E.M.'s testimony.

Although the extraneous offenses in this case occurred before the charged offense, their remoteness does not fully undermine their probative value. *See, e.g.*, *Guedea v. State*, 683 S.W.3d 549, 553 (Tex. App.—Waco 2023, no pet.) (concluding evidence relating to extraneous offenses from 1990 was "probative of [defendant]'s character or propensity to sexually abuse young female children" and first factor "weigh[ed] strongly in favor of admission"); *see also Deggs v. State*, 646 S.W.3d 916, 926 (Tex. App.—Waco 2022, pet. denied) (finding first factor weighed strongly in favor of admission where extraneous offense allegedly occurred more than 20 years before trial); *Dies*, 649 S.W.3d at 286 (finding first factor weighed strongly in

favor of admission and extraneous-offense evidence was probative of defendant's character or propensity where extraneous offense occurred approximately nineteen years before trial and twelve years before abuse of complainant).

Here, the abuse described by E.M., including the types of sexual acts committed, the presence of other people in the house when the abuse occurred, and Champ's ability to force E.M. to engage in vaginal sex with him by physically placing her onto his penis, was similar to the abuse described by Jada. *See Dennis v. State*, 178 S.W.3d 172, 180–81 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (concluding similarity of extraneous offense to charged offense made the extraneous evidence relevant to rebut theory of fabrication). There was also similarity in both gender and age; Champ abused E.M. between the ages of three and five, and again around age thirteen, and abused Jada beginning at age five until she was nine. The progression of abuse was also similar. Champ began abusing E.M. and Jada first by touching their genital area with his hands, and then progressed to forcing the girls to perform oral sex on him and, ultimately, to engage in vaginal sex. We conclude the time between those offenses is not so long as to undermine the high probative value of E.M. testimony.

Moreover, the extraneous offense evidence showed Champ's sexual interest in young girls in his care and prior sexual abuse of a young girl. *See Caston*, 549 S.W.3d at 612 ("[b]ecause the evidence of prior sexual abuse of children '[is] especially probative of [the defendant's] propensity to sexually assault children,' the

Rule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children."). The evidence was, thus, probative of Champ's character or propensity to commit acts of sexual abuse of young girls. The extraneous evidence of sexual abuse against E.M. was highly probative because it tended to (1) make a fact of consequence more probable and (2) show Champ's motive, opportunity, and intent to commit other, similar incidents of sexual abuse against a child in his care. *See Wishert v. State*, 654 S.W.3d 317, 333 (Tex. App.— Eastland 2022, pet. ref'd).

Further, the State had a substantial need for the testimony. Jada's credibility was critical to the State's case because Champ contended Jada fabricated the abuse. E.M.'s testimony was, thus, highly probative and substantially needed by the State. *See Bittick v. State*, No. 05-22-00882-CR, 2024 WL 655673, at *9 (Tex. App.— Dallas Feb. 16, 2024, no pet.) (mem. op., not designated for publication) (concluding the probative force and the State's need for the evidence were substantial and weigh in favor of admission because the defense's theory of the case was fabrication); *see also Burgess v. State*, No. 05-17-00271-CR, 2018 WL 3322886, *4 (Tex. Ap.— Dallas 2018, pet. ref'd) (mem. op., not designated for publication) (concluding probative value and State's need high when, among other things, credibility of complainant was critical). The State's need was amplified because, without E.M.'s extraneous-offense testimony, the case boiled down to a "he said, she said" case. *See Bradshaw*, 466 S.W.3d at 884. We conclude the first and second *Gigliobianco*

factors weigh in favor of admission despite the extraneous offenses' remoteness. *See, e.g., Bittick*, 2024 WL 655673, at *9 (overruling Rule 403 objection to evidence Bittick committed acts of sexual abuse on his biological daughter ten years prior to committing similar acts on the complainant was not an abuse of discretion); *see also Hansen v. State*, No. 03-23-00296-CR, 2024 WL 2335686, at *8 (Tex. App.—Austin May 23, 2024, no pet. h.) (mem. op., not designated for publication) (first two factors weigh in favor of admission under similar facts).

As for the prejudice factors, we do not think this evidence had a significant tendency to suggest a decision on an improper basis, to confuse or distract the jury from the main issues, or to cause the jury to give the evidence undue weight. Evidence of Champ's sexual abuse of E.M. was no more inflammatory than the charged offense. The jury charge instructed the jury it could not convict Champ based upon acts occurring before September 1, 2007. Similarly, the trial court mitigated the tendency of the extraneous offense evidence to confuse or distract the jury by including a limiting instruction concerning extraneous offense evidence. We presume the jury followed those instructions. *See Dies*, 649 S.W.3d at 287. Finally, E.M.'s testimony was not time-consuming or repetitive. Her testimony comprised 40 pages of 349 pages of trial testimony. Under this record, we conclude the trial court did not abuse its discretion in admitting E.M. testimony. We overrule Champ's fifth issue.

## E. Constitutional arguments

Champ next contends the admission of the extraneous offense testimony of E.M. violated the ex post facto clauses of the United States Constitution and the Texas Constitution. He argues TEX. CODE CRIM. PROC. art. 38.37, Sec. 2 is unconstitutional because it allows less or different evidence to convict a person of a sexual offense.

The court of criminal appeals has yet to address the constitutionality of article 38.37, section 2, but this Court and other courts of appeals have upheld its constitutionality under similar, if not identical, due process challenges. *See*, *e.g.*, *Coburn v. State*, No. 05-17-00819-CR, 2018 WL 3424364, *9 (Tex. App.—Dallas July 16, 2018, no pet.) (mem. op., not designated for publication) (collecting cases); *see also Strickland v. State*, No. 05-18-00170-CR, No. 05-18-00171-CR, 2019 WL 2402983, *3 (Tex. App.—Dallas June 7, 2019, no pet.) (collecting cases). There has been no change in the law, and Champ makes no arguments that would compel a different conclusion from that reached in previous opinions. We decline his invitation to revisit the issue or to hold differently in this case. Champ has failed to carry his burden to demonstrate article 38.37 is unconstitutional. *See Strickland*, 2019 WL 2402983, at *3. We overrule his sixth and seventh issues.

## F. Admission of evidence of extraneous offenses against Champ's infant daughter

In his final issue, Champ argues the trial court abused its discretion by allowing Gertrude Metzger to testify as a rebuttal witness concerning Champ's prior

statements admitting possible inappropriate conduct with his infant daughters. We apply the same standard of review and law as we applied to the other extraneous offenses challenged here.

Champ called two of his adult daughters to testify in his defense. During the redirect examination of one of his daughters, the following exchange occurred:

> Q. Has anything ever happened to you that you thought was strange or untoward between you and your father?
>
> A. No, ma'am.
>
> Q. Have you ever seen it happen with any person outside of you or Jada that your father has done something that would be untoward, inappropriate, or in any way strange to you?
>
> A. No, ma'am.

Following the conclusion of the redirect examination, the State argued this testimony opened the door to the admission of evidence concerning inappropriate touching of Champ's infant daughters. Specifically, the State argued Metzger should be permitted to testify regarding Champ's admission to her in 2016 that he had fondled the genitals of his infant daughters. Before Metzger took the stand as a rebuttal witness, Champ objected to her testimony as prejudicial and improper:

> I don't believe it's appropriate. It's obviously prejudicial. It's simply meant to further distract the jury from the facts of this case and to present conflicting and out-of-court statements that were never intended for truth or veracity, only an exchange of conversation between the parties in the very confused environment and with that, I'd ask the Court to prevent this witness from testifying.

The trial judge overruled his objections and allowed Metzger to testify.

Although Champ's counsel did not specifically cite Rule 403 as the basis for his objection, we conclude he stated the grounds for the ruling that he sought with sufficient specificity to make the trial court aware of the complaint and obtained a ruling from the trial judge. TEX. R. APP. P. 33.1. Champ, therefore, preserved error as to the admissibility of Metzger's testimony under Rule 403.

Metzger is a mentor who works with survivors of sexual violence in conservative Mennonite groups. In 2015, Metzger met E.M. at a conference in Pennsylvania for victims of sexual abuse in conservative churches. E.M. later made her outcry to Metzger. In January 2016, Metzger went to the Grays Prairie Mennonite community to facilitate a conversation between E.M. and Champ about what he had done to E.M. Metzger testified Champ admitted committing wrongdoing or inappropriate activity against his infant daughters:

> Q. Okay. And throughout the course of the conversation, did you have an opportunity to ask Mr. Champ about any wrongdoing or inappropriate activity that might have happened with his own children?
>
> A. I did.
>
> Q. And when you asked him that, how did he respond?
>
> A. There probably was some touching, inappropriate touching.
>
> Q. And did you ask what he meant by inappropriate touching?
>
> A. I did.
>
> Q. And how did he respond?
>
> A. He said to the babies, stroking to the vaginal area.
>
> Q. And were you able to clarify with him which children?

A. I asked him which -- whether it was boys and girls or just girls and he was not able to say which children but only girls.

A recording of the conversation was also played for the jury and admitted into evidence. The trial court overruled Champ's objection to admission of the recording.

On appeal, Champ argues the evidence had no probative value and is the type of evidence that would cause a jury to return a verdict on an improper emotional basis. Applying the *Gigliobianco* factors, we conclude the trial court did not abuse its discretion by allowing this testimony. Metzger's testimony had little probative force concerning whether Champ committed the acts against Jada for which he was charged. However, the evidence weighs slightly in favor of admission because it showed Champ's proclivity for touching the genitalia of young females, and the State had need of the evidence to rebut the impression left by the testimony of Champ's daughter that nothing "strange or untoward" occurred between Champ and his daughters.

As for the prejudice factors, we recognize the gender, age, and biological relationship between Champ and his infant daughters increases the inflammatory nature of the evidence. But those offenses are not so inherently inflammatory that they would tend to elicit an emotional response and impress a jury in some "irrational yet indelible way." *See Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002). Evidence of a separate sexual offense against a child admitted under article 38.37, section 2(b) is probative of a defendant's character or propensity to commit sexual abuses on children. *See Bradshaw*, 466 S.W.3d at 883. Moreover, the "plain

–47–

language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial." *Pawlak*, 420 S.W.3d at 811. Here, any tendency of the evidence to cause the jury to reach its decision on an improper basis or to confuse or distract the jury was minimized by the trial court's jury instructions. The jury charge instructed the jury that it could not convict Champ based upon acts occurring before September 1, 2007, and gave a limiting instruction concerning extraneous offense evidence. We presume the jury followed those instructions. *See Dies*, 649 S.W.3d at 287; *see also Resendiz*, 112 S.W.3d at 546. Similarly, the testimony had little tendency to be given undue weight by the jury because it was not scientific or technical and was easily understood by laypeople. The third through fifth factors, therefore, weigh in favor of admission or are neutral. Finally, the testimony encompassed only three pages of the 349 pages of testimony and was, thus, not time-consuming or repetitive.

Evaluating the evidence in light of the *Gigliobianco* factors, we conclude the trial court did not abuse its discretion by admitting Metzger's testimony. The court's error, if any, could not have improperly influenced the jury's verdict because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Colvin*, 54 S.W.3d at 85–86. Further, the admission of the testimony did not affect Champ's substantial rights. TEX. R. APP. P. 44.2(b). We overrule Champ's eighth issue.

## CONCLUSION

The evidence was legally sufficient to support the verdict, and the trial court did not abuse its discretion by admitting the extraneous offense evidence challenged on appeal. Accordingly, we overrule Champ's appellate issues and affirm the trial court's judgment.

<table>
<tr><td></td><td>/Robbie Partida-Kipness/</td></tr>
<tr><td></td><td>ROBBIE PARTIDA-KIPNESS</td></tr>
<tr><td>Do Not Publish</td><td>JUSTICE</td></tr>
<tr><td>Tex. R. App. P. 47.2(b)</td><td></td></tr>
</table>

221150F.U05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

STANLEY GERALD CHAMP,
Appellant

No. 05-22-01150-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 86th Judicial
District Court, Kaufman County,
Texas

Trial Court Cause No. 19-11252-86-
F.

Opinion delivered by Justice Partida-
Kipness. Justices Pedersen, III and
Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered this 17th day of July 2024.